# IN THE COURT OF APPEALS OF IOWA

No. 20-0936
Filed September 23, 2020

**IN THE INTEREST OF J.W.,**
**Minor Child,**

**D.W., Father,**
    Appellant.

_____

Appeal from the Iowa District Court for Monroe County, William Owens, Associate Juvenile Judge.

A father appeals the termination of his parental rights to a daughter. **AFFIRMED.**

Monte McCoy, Centerville, for appellant father.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Mary Baird Krafka, Ottumwa, attorney and guardian ad litem for minor child.

Considered by Greer, P.J., Ahlers, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**BLANE, Senior Judge.**

The father appeals the termination of his parental rights to J.W., born in late 2015. The juvenile court terminated his rights pursuant to Iowa Code section 232.116(1)(e) and (h) (2019). He contends termination was not in J.W.'s best interests, and the department of human services (DHS) failed to make reasonable efforts to reunite the family. Our review is de novo. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000).

The father in this case has suffered from a long history of mental-health issues affecting his parenting of his daughter. In 2016, J.W.'s mother died. Prior to that, J.W. and her mother lived with her mother's father, the maternal grandfather. The father came to live with J.W. and the grandfather after the mother's death. In late 2018, the grandfather called police about the father's erratic behavior. The father had been carrying weapons and stating his plan to kill all his family and leave the state with J.W. When police arrived, the father was hallucinating and carrying a knife. Police took the father to the hospital where he was involuntarily committed. A few days later, the grandfather noticed his gun was not in the locked safe where he usually kept it. He discovered it in a location where J.W. could get to it, loaded, and with the safety turned off. The father later explained he took the gun for his protection.

The father was placed on a seventy-two-hour psychiatric hold, during which he advised he was going to take J.W. and leave the state when released. DHS became involved and removed J.W. from his custody, placing her in the care of the maternal grandfather.

Throughout the child-in-need-of-assistance proceedings, the father's participation has been inconsistent and ultimately became sporadic toward the end. Under the court order, the DHS and FSRP[1] service providers attempted to engage the father in services to address his mental-health issues, substance-abuse issues, homelessness, and joblessness. The father was frequently unreachable because he changed phone numbers, did not answer or return calls, and refused to provide addresses for where he was living. He missed many visits, family team meetings, and court dates.

When the father attended supervised visits with J.W., the service provider described the parent-child interaction as distant. Over the course of the case, the father attended only fifteen of forty-five offered interactions. During one visit, the father gave J.W. medicine through an inhaler that was not prescribed for her. He explained that she had asthma and, as her father, he could give her any medication he chose. The DHS worker ended the visit. J.W. was taken to her pediatrician, who found her unharmed but followed up the next week. The father refused to identify the medication he gave J.W. or allow a photograph of the inhaler he used. He became belligerent with the DHS worker over the phone while discussing the situation but eventually admitted it was an albuterol inhaler.

In May 2019, more than six months after the initial removal, the father finally attended a substance-abuse evaluation. But the counselor had many concerns about the evaluation: the father did not give a good enough sample for the drug screen, so she rated him presumptively positive. She recommended he attend

---

[1] FSRP is an acronym for family safety, risk, and permanency services.

inpatient treatment, but the father refused. She requested a follow-up appointment, for which the father did not appear.

Eventually, the DHS was able to locate the father in a group-home setting. When the DHS worker visited him there and attempted to inform him about and engage him back into services, he became belligerent with her and said he was not going to drug treatment and did not need to follow any court-ordered recommendations. He felt he did not have a substance-abuse problem or need mental-health services. Despite offering several other services for transportation and insurance, the father continued to insist he did not need such services and would not participate in them. The DHS lost contact with him for several months because the father did not keep a consistent phone number, return calls, or answer the door to any known address. He last saw J.W. in August 2019.

In December 2019, the DHS discovered the father was being held in the Polk County Jail on burglary charges. He remained jailed through the termination hearing. On subsequent visits in the jail, he continued to tell the DHS he did not need to do anything the court ordered, and the DHS should return J.W. to him immediately upon his being released. Following a hearing, the juvenile court terminated his parental rights, and the father appealed. He raises two issues on appeal. First, he contends termination is not in J.W.'s best interests when a guardianship is available. Second, he contends the DHS failed to make reasonable efforts to reunite him with J.W.

**Termination Versus Guardianship.** After a permanency hearing, the court must select from several statutorily delineated options. *See* Iowa Code § 232.104(2). Those options include, among others, continuing placement of the

child for six months, transferring guardianship and custody of the child to suitable others, transferring sole custody of the child from one parent to the other, or directing the county attorney to institute termination proceedings. *Id.* § 232.104(2)(b), (d)(1), (d)(2). Before transferring guardianship and custody to another person, the court must find evidence exists of all the following:

> a. A termination of the parent-child relationship would not be in the best interest of the child.
> b. Services were offered to the child's family to correct the situation which led to the child's removal from the home.
> c. The child cannot be returned to the child's home.

*Id.* § 232.104(4). The court made the following finding regarding a potential guardianship with the maternal grandfather:

> [T]he facts here do not support that a guardianship would be appropriate. [J.W.] is a young child and given her age, the length of time she has been removed, [the father's] lack of progress, and the availability of other viable and preferred permanency options a guardianship would not be appropriate.

We agree with the juvenile court. The person who has taken care of J.W. for the longest time in her life is her grandfather. He wants to adopt her and provide a permanent home. The evidence shows they are bonded, and she seeks him for safety and comfort. Meanwhile, the father has made no significant progress to be able to take care of J.W. and does not challenge the conclusion of the juvenile court that his rights should be outright terminated. Guardianship is not a preferred legal state for a child because it extends the period of instability and impermanency. *See In re B.T.*, 894 N.W.2d 29, 32 (Iowa Ct. App. 2017). J.W. will be able to have a permanent home with her grandfather, which is the best outcome for her safety and wellbeing. *See* Iowa Code § 232.116(2) (describing the best-interests test in termination-of-parental-rights proceedings). We cannot conclude

termination of the father's parental rights should have been delayed in favor of a guardianship. Proceeding to termination was appropriate.

**Reasonable Efforts.** Iowa Code section 232.102(7) requires the DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." *See C.B.*, 611 N.W.2d at 493. "The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *Id.* The reasonable-efforts requirement is not "a strict substantive requirement of termination." *Id.* But when relying on paragraphs (f) or (h) of Iowa Code section 232.116(1) as the grounds for termination, as it did here, the State must show the DHS made reasonable efforts toward reunification as part of its ultimate burden of proof. *See In re L.T.*, 924 N.W.2d 521, 527 (Iowa 2019).

But to preserve error, the parent must "demand other, different or additional services prior to the termination hearing." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999). On appeal, the father complains about the location of offered visitation—he wanted interactions to take place at his uncle's restaurant, but the DHS felt it was not child-friendly and contained too many distractions from parenting interactions. Visitation was changed to public fast-food restaurants, and the father made no further complaints until the termination hearing. As such, we agree he failed to preserve error on his reasonable-efforts claim. *See* Iowa Code § 232.99(3) ("[F]ailure to identify a deficiency in services or to request additional services may preclude the party from challenging the sufficiency of the services in a termination of parent-child relationship proceeding.").

If we reached the question, we would find the DHS did not fail to make reasonable efforts in this case. A public fast-food restaurant was a reasonable location for interactions versus the uncle's restaurant. The juvenile court characterized the efforts of the DHS and FSRP staff to provide services to the father as "diligent." We agree with this view. At almost every opportunity and attempt by the DHS to provide services, the father has either balked or outright refused to participate and utilize them.

We affirm termination of the father's parental rights.

**AFFIRMED.**